# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

------------------------------------------------x

GRETCHEN CARLSON,       :

            Plaintiff,      :

       v.             :

ROGER AILES,           :

            Defendant.    :

------------------------------------------------x

Civil Action No.:  2:16-cv-04138-JLL-JAD

---

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY JUDICIAL PROCEEDINGS

---

**SMITH MULLIN, P.C.**
Nancy Erika Smith, Esq.
(nsmith@smithmullin.com)
Neil Mullin, Esq.
(nmullin@smithmullin.com)
240 Claremont Avenue
Montclair, New Jersey 07042
(973) 783-7607
(973) 783-9894-fax

-and-

**GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP**
Martin S. Hyman, Esq. (*pro hac vice*)
(mhyman@golenbock.com)
Matthew C. Daly, Esq. (*pro hac vice*)
(mdaly@golenbock.com)
711 Third Avenue
New York, New York 10017
(212) 907-7300
(212) 754-0330-fax

**Of Counsel and on the Brief:**
   **NANCY ERIKA SMITH, ESQ.**
   **NEIL MULLIN, ESQ.**
   **MARTIN S. HYMAN, ESQ.**
   **MATTHEW C. DALY, ESQ.**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.     AILES ACTED IN HIS PERSONAL CAPACITY AND CONTRARY
              TO THE INTERESTS OF FOX NEWS NETWORK WHEN HE
              RETALIATED AGAINST PLAINTIFF BECAUSE SHE COMPLAINED
              OF DISCRIMINATION AND REBUFFED HIS SEXUAL ADVANCES . . . . . 3

      B.     CARLSON SUED AILES UNDER THE NEW YORK CITY
              HUMAN RIGHTS LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      C.     AILES, A NON-SIGNATORY, SEEKS TO FORCE THIS
              ACTION INTO A SECRET ARBITRATION PROCEEDING . . . . . . . . . . . . . 5

      D.     AILES, BY HIS CONDUCT, HAS ACKNOWLEDGED THAT
              THE ARBITRATION CLAUSE DOES NOT APPLY TO HIM . . . . . . . . . . . . 7

POINT I:     AILES HAS NOT MET THE STANDARD
              REQUIRED TO COMPEL ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT II:    THE ARBITRATION CLAUSE DOES NOT APPLY
              TO CARLSON'S CLAIM AGAINST AILES . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.     THE ARBITRATION CLAUSE DRAFTED BY FOX LAWYERS
              SPECIFICALLY INCLUDES ONLY CORPORATE ENTITIES . . . . . . . . . . 10

      B.     AILES DOES NOT FIT WITHIN ANY EXCEPTION
              THAT WOULD ALLOW HIM TO ENFORCE THE
              ARBITRATION CLAUSE AS A NON-SIGNATORY . . . . . . . . . . . . . . . . . . 16

           1.    Carlson's Claim Does Not Fall Within the Agency Exception
                  Because She Sued Ailes In His Individual Capacity For A
                  Statutory Tort Claim That Does Not Derive From Or
                  Depend on the Employment Contract . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                a.    Neither the Contract nor Fox News Network's
                        Conduct is at Issue in Ms. Carlson's Claim and
                        Therefore Ailes' Cases are Plainly Distinguishable . . . . . . . . . . 17

b.    Under Facts Similar to this Case, Courts Have Not
Permitted Non-Signatories to Compel Arbitration . . . . . . . . . . 20

c.    There Is No Policy Reason to Permit Ailes
To Enforce the Arbitration Clause . . . . . . . . . . . . . . . . . . . . . . . 25

2.    Carlson's Claim Against Ailes Also Does Not Fall Within
The Estoppel Exception Because it Does Not Rely on the
Existence of the Employment Contract . . . . . . . . . . . . . . . . . . . . 27

POINT III:    EVEN IF THE ARBITRATION CLAUSE APPLIED TO CARLSON'S
CLAIM AGAINST AILES, WHICH IT DOES NOT, AILES SHOULD
BE ESTOPPED FROM INVOKING IT BECAUSE HE IS IN
MATERIAL BREACH OF ITS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

-ii-

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES</u>:**

*Arnold v. Arnold Corp.*, 920 *F.2d* 1269 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 17, 23

*Atalese v. U.S. Legal Servs. Group, L.P.*, 99 *A.3d* 306 (N.J. 2014) . . . . . . . . . . . . . . . . . . . . . 13

*Beame v. DeLeon*, 662 *N.E.2d* 752 (N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 27

*Bleumer v. Parkway Ins. Co.*, 649 *A.2d* 913 (N.J. Super. Ct. Law Div. 1994) . . . . . . . . . . . . 25

*Britton v. Co-op Banking Group*, 4 *F.3d* 742 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 18, 21, 24

*Constantino v. Frechette*, 897 *N.E.2d.* 1261 (Mass. App. Ct. 2008) . . . . . . . . . . . . . . . 14, 21, 24

*Council of W. Elec. Tech. Employees v. W. Elec. Co.*, 238 *F.2d* 892 (2d Cir. 1956) . . . . . . . . 28

*Devon Robotics v. DeViedma*, 2012 WL 3627419, at *9 (E.D. Pa. Aug. 23, 2012) . . . . . 9, 20, 25

*Dietel v. Day*, 16 *Ariz.App.* 206 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*DiMartino v. Dooley*, 2009 WL 27438, at *4 (S.D.N.Y. Jan. 6, 2009) . . . . . . . . . . . . . . . . . . . 9

*Expomotion, Ltd. v. Heidepriem-Santandrea Inc.*, 101 *Misc.2d* 593 (Civ.Ct. 1979) . . . . . . . . 23

*Fuller v. Guthrie*, 565 *F.2d* 259 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13

*Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.*,
732 *A.2d* 665 (N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Hirsch v. Amper Fin. Servs., LLC*, 215 *N.J.* 849 ( 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 25

*Hirschfeld Prods., Inc. V. Mirvish*, 630 *N.Y.S.2d* 726 (N.Y. App. Div. 1995), *aff'd*,
88 *N.Y.2d* 1054 (N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*JLM Indus., Inc. v. Stolt-Nielsen S.A.*, 387 F.3d 163 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . 9, 27

*Karnette v. Wolfpoff & Abramson, LLP*, 444 *F.Supp.2d* 640 (E.D. Va. 2006) . . . . . . . . . . . . . 28

*Kentucky v. Graham*, 473 *U.S.* 159, 105 S.Ct. 3099 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lafarge Bldg. Materials, Inc. V. Pozament Corp.*, 28 *Misc.3d* 1228(A),
2010 WL 3398537, at *8 (N.Y. Sup. Ct. Aug. 24, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Letizia v. Prudential Bache Secs., Inc.*, 802 *F.2d* 1185 (9th Cir. 1986) . . . . . . . . . . . . . . . . 18, 23

*Marcus v. Frome*, 275 *F.Supp.2d* 496 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*McCarthy v. Azure*, 22 *F.3d* 351 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . 9, 13, 14, 22-26

*Miness v. Ahuja*, 713 *F.Supp.2d* 161 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Miron v. BDO Siedman, LLP*, 342 F. Supp. 2d 324 (E.D. Pa. 2004) . . . . . . . . . . . . . . . . . . . 9, 27

*Norcast S.AR.L. v. Castle Harlan, Inc.*, No. 12 Civ. 4973, 2014 WL 43492,
at *4 (S.D.N.Y. Jan. 6, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 27, 28

*Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 *N.U.S.2d* 24 (1st Dep't 2012) . . . . . . . 28

*Parsons & Whittemore Overseas Co. V. Societe Generale De L'Industrie Du Papier*,
508 *F.2d* 969 (2d Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 *F.3d* 1110 (3d Cir. 1993) . . 17, 20, 23

*Republic of Iraq v. ABB AG*, 769 *F.Supp.2d* 605 (S.D.N.Y. 2011) . . . . . . . . . . . 9, 11, 14-15, 19

*Roby v. Corp. of Lloyd's*, 996 *F.2d* 1353 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

*Rodriguez v. Raymours Furniture Co.*, ---A.3d. —, 2016 WL 3263896,
at *11 (N.J. June 15, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ross v. Am. Express Co.*, 547 F.3d 137 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 27

*Tracinda Corp. V. DaimlerChrysler AG*, 502 *F.3d* 212 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . 25

*Westmoreland v. Sadoux*, 299 F.3d 462 (5th Cir. 2002), *rehearing denied*,
2002 WL 31049584 (5th Cir. Aug. 26, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14, 21, 14

## STATUTES

N.Y.C. Admin. Code § 8-101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

N.Y.C. Admin. Code § 8-107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.Y.C. Admin. Code §§ 8-107(1)(a), 8-107(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.Y.C. Admin Code § 8-107(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.Y.C. Admin Code § 8-502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 . . . . . . . . . . . . . . . . . . . . . 5

## PRELIMINARY STATEMENT

Defendant Roger Ailes asks this Court to deprive Plaintiff Gretchen Carlson of her statutory and Constitutional right to a jury trial based on his assertion that the arbitration clause in Ms. Carlson's employment contract with Fox News Network LLC inures to his benefit. This argument must fail because the contract itself, written by Fox lawyers, says the opposite. In the contract's first paragraph, Fox specifically identifies the only parties as "Gretchen Carlson ('Performer') and Fox News Network LLC ('Fox'). The contract does not define "Fox" to include any officers and executives such a Roger Ailes, although executive contracts typically have such inclusive language,

Moreover, the appended "Standard Terms and Conditions" exhibit which contains the arbitration agreement provides: "This Agreement shall inure to the benefit of Fox's successors, assignees, and Affiliates . . . ." That clause refers only to corporate entities and does not state that the contract or its arbitration clause shall inure to the benefit of Roger Ailes or any other individual. Employers who want to bind officers, executives, managers, and other employees to the employment contract or the arbitration clause do so by explicitly including them. Fox specifically chose not to do so.

Thus, the plain contract language allows Carlson to sue Ailes in a court rather than a secret arbitration and likewise gives Defendant Ailes the right to sue Fox employees in a public court proceeding. It would be grossly inequitable, asymmetrical and contrary to settled law discussed within to read the contract as Ailes urges this Court by requiring Carlson to secretly arbitrate against Ailes, a non-signatory, while permitting Ailes to publicly sue employees in open court.

Since the contract by its plain and unambiguous terms does not allow Ailes to deprive Ms. Carlson of her right to our civil justice system, the inquiry should end there. However, there

are additional legal reasons to deny Ailes' motion.

It is significant that Ms. Carlson's claim of sexual harassment and retaliation is not based on her contract with Fox.   Her claim under the New York City Human Rights Law is independent of and not entwined with any claims of breach of contract, nor does she seek any contractual remedies.   All of the cases on which Defendant Ailes relies in order to force Ms. Carlson into a secret arbitration proceeding are readily distinguishable because they concern plaintiffs whose claims relied on the existence and terms of the contract containing the arbitration clause and/or alleged that the actual signatory to the contract was somehow liable. Here, Ms. Carlson asserts no claims of contractual breach, nor does she seek any relief under the contract. Her New York City Human Rights Law claim against Ailes is based on an independent duty that he owed to her regardless of any employment contract.   Moreover, Ms. Carlson's complaint expressly alleges that Ailes acted outside the scope of his agency, authority and employment and contrary to the interests of Fox News Network, and instead acted to satisfy his own prurient sexual interests.   Under similar circumstances, courts have held that a non-signatory cannot rely on an agency or estoppel theory.

Additionally, even if the arbitration clause were applicable to Carlson's claim against Ailes, which it is not, Ailes forfeited any right to enforce it because, in violation of the Draconian confidentiality clause embedded in Fox's arbitration clause, he has materially breached that clause by causing documents and other information about this matter to be publicly disseminated in an attempt to smear Ms. Carlson. No one in "default" of an arbitration clause is permitted to compel arbitration under 9 U.S.C. §3.

## STATEMENT OF THE CASE

**A.   AILES ACTED IN HIS PERSONAL CAPACITY AND CONTRARY TO THE INTERESTS OF FOX NEWS NETWORK WHEN HE RETALIATED AGAINST PLAINTIFF BECAUSE SHE COMPLAINED OF DISCRIMINATION AND REBUFFED HIS SEXUAL ADVANCES**

Ms. Carlson was employed by Fox News Network as an on-air personality from 2005 through her termination on June 23, 2016. Comp. ¶¶ 8, 25.[1]  During that time, Ailes was the Chairman and CEO of Fox News Network. *Id.* ¶ 3.  After Ms. Carlson complained about sexual harassment and a hostile work environment Ailes, in his personal capacity, engaged in retaliation.   At the same time, Ailes also retaliated against Carlson because she refused his sexual advances. *See generally* Complaint.

The Complaint notes that, "[i]n doing these things, Ailes did not act in the interests of Fox News, but instead pursued a highly personal agenda." *Id.* ¶ 15.  The Complaint further alleges:

> Ailes undertook these discriminatory and retaliatory actions in his individual capacity and for personal and unlawful purposes.  His retaliation against Carlson was outside the scope of his authority, employment and agency at Fox News, which has adopted and professes to support anti-discrimination, anti-harassment and anti-retaliation policies. *Id.* ¶ 26.

By way of example, in September 2015, Carlson met with Ailes to seek to bring to an end his retaliatory and discriminatory treatment of her. *Id.* ¶ 21.   As stated in the Complaint: "During that meeting in Ailes' office on September 16, 2015, Ailes stated to Carlson:  'I think you and I should have had a sexual relationship a long time ago and then you'd be good and better and I'd be good and better,' adding that 'sometimes problems are easier to solve' that way." *Id.* ¶ 22. The Complaint further states that, "Prior to and during that meeting, Ailes had made it clear to Carlson that he had the power to make anything happen for her if she listened to

---

[1] A copy of the Complaint is submitted herewith as Exhibit 1 to the Certification of Nancy Erika Smith, Esq. ("Smith Cert.").

him and 'underst[ood] what he was saying." *Id.* ¶ 23. "Carlson refused to engage in a sexual relationship or participate in sexual banter with Ailes so Ailes retaliated." *Id.* ¶ 24.

Similarly, Ailes harassed and discriminated against Carlson in his personal capacity for his own illicit motives, and contrary to the interests of Fox News Network, by, among other things: asking her to turn around so that he could view her posterior; commenting repeatedly about Carlson's legs; making sexual advances by various means, including by stating that if he could choose one person to be stranded with on a desert island, she would be that person; asking Carlson how she felt about him, followed by: "Do you understand what I'm saying to you?"; boasting to other attendees (at an event where Carlson walked over to greet him) that he always stays seated when a woman walks over to him so she has to "bend over" to say hello; and embarrassing Ms. Carlson by stating to others in her presence that he had "slept" with three former Miss Americas but not with her. *Id.* ¶ 20.

The Complaint also states that Ailes, in furtherance of his personal attack on Carlson, acted contrary to the interests of Fox News Network by, among other things, removing Carlson from her position as co-host of the "Fox & Friends" morning show notwithstanding that she was highly popular and that the program had "achieved higher ratings than any other cable news morning show," *id.* ¶ 10; "assigning her fewer of the hard-hitting political interviews that are coveted by political correspondents (notwithstanding that she had received acclaim for her political interviews)," *id.* ¶ 14; and ultimately terminating Carlson on June 23, 2016, notwithstanding that "Carlson's show consistently ranked number one among cable news programs in her time slot and achieved its highest Nielson ratings ever in the final quarter of 2015 and in the first quarter of 2016, with ratings in her final month of June 2016 up 33% in total viewers year to date," *id.* ¶ 18.

### B.   CARLSON SUED AILES UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

On July 6, 2016, Ms. Carlson commenced this action against Ailes in the Superior Court of New Jersey (where Ailes maintains a residence), asserting a single claim for violations by Ailes of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.*  The New York City Human Rights Law makes it an unlawful discriminatory practice for an employee to discriminate against another employee in the workplace or to retaliate if another employee complains about unlawful discrimination.   N.Y.C. Admin. Code §§ 8-107(1)(a), 8-107(7) (emphasis added).

The New York City Human Rights Law provides that the offending employee alone may be liable under the statute.  For example, the statute provides that where an employee engages in discriminatory conduct, the employer may be liable only in limited circumstances.  *Id.* § 8-107(13)(b).  Even if one of the conditions for employer liability is met, the plaintiff can still choose to sue only the perpetrator.  Indeed, the statute builds in an additional defense for the employer.  It allows the employer to establish that it had, among other things, policies and procedures for the prevention and detection of unlawful discrimination as well as meaningful and responsive procedures for investigating complaints of discrimination, *etc.*  *Id.* § 8-107(13)(d). Accordingly, under the New York City Human Rights Law, there are additional hurdles, and ancillary issues that would need to be litigated, if Ms. Carlson chose to sue her former employer as opposed to suing the offending employee alone.

### C.   AILES, A NON-SIGNATORY, SEEKS TO FORCE THIS ACTION INTO A SECRET ARBITRATION PROCEEDING

On July 8, 2016, Ailes filed a Notice of Removal of the action to this Court and a motion to compel arbitration and stay judicial proceedings.  Ailes, however, is not a party to any

arbitration agreement with Carlson, nor did she ever agree to an arbitration provision that applies to Ailes.  Ailes relies on an arbitration clause that is found in section 7 of the purported "Standard Terms and Conditions" that were appended to Carlson's June 19, 2013 employment contract with Fox News Network (the "Employment Contract").

Nothing in the Employment Contract, the Standard Terms and Conditions, or the arbitration clause makes the arbitration clause applicable to a claim against Ailes or any other Fox News officer or employee.  To the contrary, the Employment Contract states that the only "parties" thereto are Carlson and Fox News Network.  Employment Contract at 1.  The Employment Contract states that it, together with the Standard Terms and Conditions, "will constitute the understanding *between the parties* . . . ." *Id.* (emphasis added).  Similarly, section 15.1 of the Employment Contract is an integration clause stating that "[t]his Agreement constitutes the entire agreement and understanding *between the parties* . . . ." *Id.* § 15.1.

The Employment Contract makes no mention whatsoever of Ailes.  He is not even the corporate representative who signed the Employment Contract on behalf of Fox News Network. The Employment Contract also does not give any indication that other employees may be considered parties thereto or have been granted any right to enforce its provisions (or the provisions of the Standard Terms and Conditions).  Rather, the Standard Terms and Conditions, which contain the arbitration clause, expressly *exclude* employees from those who may benefit from it.  Section 15 of the Standard Terms and Conditions states:  "This Agreement shall inure to the benefit of Fox's successors, assignees, and Affiliates. . . .  As used in this Agreement, the term 'Affiliate' shall mean any company controlling, controlled by or under common control with Fox."  Standard Terms and Conditions § 15.1.  Officers or employees are not mentioned.

The Contract's plain language excludes officers and employees from the intended beneficiaries, and it would be contrary to the contracting parties' intent, and wholly unfair, to

6

permit Ailes, a non-party to the Contract, to benefit from the Contract's arbitration clause, while he would be under no obligation to arbitrate any claim against Carlson or any other Fox employee.

### D.   AILES, BY HIS CONDUCT, HAS ACKNOWLEDGED THAT THE ARBITRATION CLAUSE DOES NOT APPLY TO HIM

The arbitration clause not only provides for arbitration, but it also includes exceptionally broad confidentiality restrictions.  It provides that, "Such arbitration, all filings, evidence and testimony connected with the arbitration, *and all relevant allegations and events leading up to the arbitration*, shall be held in strict confidence. . . .  Breach of confidentiality by any party shall be considered to be a material breach of this Agreement."  Standard Terms and Conditions § 7 (emphasis added).  Such a "gag order"  would effectively prohibit Carlson from telling anyone (including the EEOC or the New York City Commission on Human Rights) about the circumstances of her ordeal, interviewing potential witnesses to support her claim, and restoring her credibility, in the wake of Ailes' smear campaign, by presenting irrefutable evidence of Ailes' wrongdoing in a public forum.

While Ailes seeks to use the arbitration clause as a shield in this action, by his conduct he has acknowledged that the arbitration clause does not apply to him:  he has made repeated public disclosures concerning Carlson's claim, which, if the arbitration clause were enforceable and applicable to him, would violate its confidentiality provision       For example, within hours after Carlson filed the Complaint, Ailes issued a press statement disclosing "allegations and events" leading up to Carlson's claim by stating, among other things, that her termination purportedly "was due to the fact that her disappointingly low ratings were dragging down the afternoon lineup."  Smith Cert. Ex. 2.  That assertion is directly contradicted in the Complaint.[2]

---

[2] Fox News issued a sharply different statement, announcing that it is taking the allegations seriously and has "commenced an internal review of the matter."  Smith Cert. Ex. 2.

Ailes later publicly released four handwritten "thank you" notes that Carlson allegedly provided to him over the course of her eleven-year tenure at Fox News (which of course show nothing more than that Carlson was devoted to, and wanted to keep, her job). *Id.* Ex. 3. Ailes also released to the press an internal memorandum that, if authentic, would actually bolster Ms. Carlson's claim. *Id.*; *see also id.* Exs. 4 & 5. By leaking internal documents and making public disclosures concerning this matter -- even after demanding arbitration -- Ailes has acknowledged that the arbitration clause (with its confidentiality restrictions) does not apply to Carlson's claim against him. To the extent the arbitration clause does apply, which it does not, Ailes is in material breach of its provisions and should be estopped from invoking it.[3]

In addition, Defendant Ailes has threatened Carlson and his lawyers with legal action claiming that Ms. Carlson and her lawyers are somehow responsible for the statements of other women about their experiences with Defendant Ailes. The threat is clear in an email sent by Ailes' counsel on Saturday July 9, 2016 after Ailes filed his motion demanding arbitration: "Mr. Ailes has been and will continue to monitor your unlawful conduct in the media and take steps to hold you responsible." Smith Cert., Ex.6.

## POINT I

## AILES HAS NOT MET THE STANDARD REQUIRED TO COMPEL ARBITRATION

As the Second Circuit has held, it is a "bedrock principle" of arbitration law that:

> [A]rbitration is a matter of consent, not coercion. Specifically, arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit. Thus, while the FAA expresses a strong federal policy in favor of arbitration, the purpose of Congress in enacting the FAA was to make arbitration agreements as enforceable as other contracts, *but not more so.*

---

[3] Any other result would be fundamentally unfair because it would allow Ailes to call Carlson a liar in public (as he has done), and then recede into the shadows of confidential arbitration to prevent her from publicly demonstrating that she was telling the truth.

*Ross v. Am. Express Co.*, 547 F.3d 137, 142-43 (2d Cir. 2008) (holding that issuing bank could not compel cardholders to arbitrate based on arbitration clause not signed by issuer)  (internal quotes and alterations omitted, emphasis in original) (quoting *JLM Indus., Inc. v. Stolt-Nielsen S.A.*, 387 F.3d 163, 171 (2d Cir. 2004)).

Thus, "[t]he presumption of arbitrability has never been extended to claims by or against non-signatories." *Devon Robotics v. DeViedma*, No. 09-cv-3552, 2012 WL 3627419, at *9 (E.D. Pa. Aug. 23, 2012) (citing *Miron v. BDO Siedman, LLP*, 342 F. Supp. 2d 324, 332 (E.D. Pa. 2004)); *see also Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002), *rehearing denied*, 2002 WL 31049584 (5th Cir. Aug. 26, 2002) ("[The FAA] signifies that we will read the reach of an arbitration agreement between parties broadly, but that is a different matter from the question of who may invoke its protections."); *McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994) ("The federal policy, however, does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear."); *Hirsch v. Amper Fin. Servs., LLC*, 215 NJ 849, 71 A.3d 849, 861 ( 2013) ("[A]lthough we are sensitive to the preference for resolving ambiguities in arbitration clauses in favor of compelling arbitration, that preference only applies when an agreement exists between the parties to arbitrate their disputes.") *Hirsch, supra* 215 *N.J.* at 196.

Rather, only in rare circumstances will a non-signatory be permitted to enforce an arbitration agreement. *Devon Robotics*, at *9; *see also Westmoreland v. Sadoux*, 299 F.3d at 465 ("we will allow a nonsignatory to invoke an arbitration agreement only in rare circumstances").

"On a motion to compel arbitration, the standard the court applies is similar to the standard applied on a motion for summary judgment: If there is a dispute as to a material issue of fact, then a trial to resolve the issue of fact is necessary." *Di Martino v. Dooley*, No. 08 Civ. 4606, 2009 WL 27438, at *4 (S.D.N.Y. Jan. 6, 2009). In *Republic of Iraq v. ABB AG*, the Court

held:

> When the matter hinges on interpretation of a disputed contract provision, a court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use and it should grant summary judgment when the words of the contract convey a definite and precise meaning.

769 F. Supp. 2d 605, 609 (S.D.N.Y. 2011) (internal quotes omitted).

There is no ambiguity here. The intent of the parties is clear. The parties specifically declined to make Ailes a party to the arbitration agreement. Plaintiff Carlson has not waived her statutory and Constitutional right to sue Defendant Ailes and to avail herself of the public and fair process provided by our civil justice jury trial system.

## POINT II

### THE ARBITRATION CLAUSE DOES NOT
### APPLY TO CARLSON'S CLAIM AGAINST AILES

### A.  THE ABITRATION CLAUSE DRAFTED BY FOX LAWYERS
### SPECIFICALLY INCLUDES ONLY CORPORATE ENTITIES

The Second Circuit has held that "[a] decision to arbitrate must be consciously made" because "'by agreeing to submit disputes to arbitration, a party relinquishes his courtroom rights, including that to subpoena witnesses, in favor of arbitration with all its well-known advantages and drawbacks.'" *Fuller v. Guthrie*, 565 F.2d 259, 261 (2d Cir. 1977) (quoting *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier*, 508 F.2d 969 (2d Cir. 1974)); *see also Westmoreland*, 299 F.3d at 465 ("An agreement to arbitrate is a waiver of valuable rights that are both personal to the parties and important to the open character of our state and federal judicial systems -- an openness this country has been committed to from its inception.  It is then not surprising that to be enforceable, an arbitration clause must be in writing and signed by the party invoking it.").  The contract must therefore evince a "conscious decision" for the subject claim to be covered by the arbitration clause. *Fuller*, 565 F.2d at 261. "[C]ourts should not override the clear intent of the parties, or reach a result inconsistent with the

10

plain text of the contract, simply because the policy favoring arbitration is implicated." *Norcast , S.AR.L. v. Castle Harlan, Inc.*, No. 12 Civ. 4973, 2014 WL 43492, at *4 (S.D.N.Y. Jan. 6, 2014) (internal quotes omitted).

Moreover, as the Supreme Court of New Jersey has held, where the plaintiff's claims "implicate the right to a jury trial . . . [t]hat recognition informs our analysis given the importance of ensuring that a party has actually waived its right to initiate a claim in court in favor of submitting to binding arbitration." *Hirsch*, 215 *N.J.* 174, 194 (2013).

Here, Ailes is asking the Court to restrict substantial rights of Carlson by imposing the arbitration clause and gag order on her claim against him under the New York City Human Rights Law. Such a restriction on Carlson's rights should never be imposed absent a "definite and precise" indication that it was her intent, when she entered into the Employment Contract with Fox News Network, that such a claim against Ailes would be subject to arbitration. *Republic of Iraq*, 769 F. Supp. 2d at 609. Allowing Ailes to force this case into a secret arbitration proceeding would prevent Carlson, a public figure, from presenting her claim in open court against Ailes, also a public figure, and from having that claim decided by a jury of her peers.[4] Indeed, the arbitration clause not only imposes confidentiality on the arbitration

---

[4] In arbitration, the rules of evidence do not apply, the ability to obtain discovery of evidence is curtailed, the rules of civil procedure do not apply, there is no meaningful appeal, the employee is required to pay fees of the arbitrators, and the arbitrators do not reflect the diversity of our nation which would be better represented by a jury of one's peers. Indeed, it is well-reported that an infirmity with arbitration is its dominance by Caucasian men. *See* F. Peter Phillips, *It Remains a White Male Game*, International Institute for Conflict Prevention & Resolution, Inc., Nov. 27, 2006 (available at http://www.cpradr.org/ About/NewsandArticles/ tabid/265/ID/90/It-Remains-A-White-Male-Game-NLJ.aspx); Caley E. Turner, *"Old, White, and Male"*: *Increasing Gender Diversity in Arbitration Panels*, International Institute for Conflict Prevention & Resolution, Inc., Summer 2014 (available at http://www.cpradr.org/About/NewsandArticles/ tabid/ 265/ID/884/Old-White-and-Male-Increasing-Gender-Diversity-in-Arbitration-Panels.aspx). Thus, "[t]o enforce a waiver-of-rights provision in this setting [a statutory discrimination claim], the Court requires some concrete manifestation of the employee's intent as reflected in the text of the agreement itself." *Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.*, 732 A.2d 665, 672 (N.J. 2001).

proceeding itself, but also broadly states that "all relevant allegations and events leading up to the arbitration, shall be held in strict confidence." Standard Terms and Conditions § 7. Enforcing that provision in this matter would prevent Carlson from speaking with enforcement agencies or even interviewing potential witnesses to support her claim and thus undermine the legal framework by which victims of sexual harassment, discrimination and retaliation can obtain redress from sexual predators and other wrongdoers.[5] It would essentially force her to relive and endure Ailes' discrimination and retaliation in secret and allow Ailes -- a national news executive and presumed proponent of a free press -- to engage in and conceal his deviant and illegal behavior with full immunity from public scrutiny.[6]

Application of the arbitration provision also would deprive Carlson of the statutory rights afforded to her under the New York City Human Rights Law to have the choice to bring the claim in court. N.Y.C. Admin. Code § 8-502. Indeed, imposing the restrictive and secretive

---

[5] The United States Equal Employment Opportunity Commission issued a policy statement on July 7, 2016, explaining that mandatory arbitration clauses in employment agreements are a barrier to achieving equality in the workplace. The EEOC stated:

> Mandatory arbitration policies shield many industries and their employment practices from public scrutiny by requiring individuals to submit their claims to private arbiters rather than public courts. By taking discrimination claims out of the public view, forced arbitration can prevent employees from learning about similar concerns shared by others in their workplace and can impede the development of the law. It can also weaken an employer's incentive to proactively comply with the law, when organizations are not held publically accountable for violations of ant-discrimination laws.

Equal Employment Opportunity Commission, *Advancing Opportunity: A Review of the Systematic Program of the U.S. Equal Employment Opportunity Commission*, July 7, 2016 (available at https://www.eeoc.gov/eeoc/systemic/review/).

[6] Such a provision is particularly unfair because Ailes chose to humiliate Carlson publicly, *see, e.g.*, Comp. ¶ 20, and has publicly disparaged and threatened her and her counsel following the commencement of this action, *see* Smith Cert. Exs. 2-6, yet the arbitration clause would effectively prevent Carlson from publicly defending herself and resurrecting her image and career, which Ailes sought to sabotage.

arbitration procedures on Carlson's claim against Ailes would be in direct conflict with New York's policy against discrimination. As the New York Court of Appeals has held: "The governmental policy against discrimination enjoys the highest statutory priority, based upon legislative findings that discrimination "threaten[s] the rights and proper privileges of [the City's] inhabitants and menace[s] the institutions and foundation of a free democratic state." *Beame v. DeLeon*, 662 N.E.2d 752, 756 (N.Y. 1995) (quoting N.Y.C. Admin. Code § 8-101).[7]

Fox lawyers drafted an arbitration clause appended to Ms. Carlson's latest contract (it was not included as part of her three prior contracts) which specifically identified the parties who were bound by its terms. Clearly, Ms. Carlson never waived her substantial rights under the New York City Human Rights Law based on the language in that clause. The Employment Contract indicates no "conscious decision" that the arbitration clause covers this claim. *Fuller*, 565 F.2d at 261. To the contrary, the Employment Contract repeatedly states that the only "parties" thereto are Carlson and Fox News Network. Employment Contract at 1 & § 15.1. In *McCarthy*, 22 F.3d at 358-59, the Court held that an integration clause such as the one found in section 15.1 of the Employment Contract indicates an intent to limit arbitral rights to signatories.

The Employment Contract makes no mention whatsoever of Ailes -- he is not even the corporate representative who signed the Employment Contract on behalf of Fox News Network.

---

[7] In a string of recent decisions, the Supreme Court of New Jersey has held that an arbitration clause or other contractual provision that restricts an individual's ability to pursue a discrimination claim must be construed strictly and/or is unenforceable. *See Garfinkel*, 773 A.2d at 672 ("The Court will not assume that employees intend to waive [rights under anti-discrimination law] unless their agreements so provide in unambiguous terms."); *Atalese v. U.S. Legal Servs. Group, L.P.*, 99 A.3d 306, 316 (N.J. 2014) ("the wording of the service agreement did not clearly and unambiguously signal to plaintiff that she was surrendering her right to pursue her statutory [anti-discrimination] claims in court"); *Rodriguez v. Raymours Furniture Co.*, --- A.3d. ---, 2016 WL 3263896, at *11 (N.J. June 15, 2016) (holding that contractual shortening of anti-discrimination law's statute of limitation was unenforceable as "contrary to the public policy expressed in" the statute). These decisions are even more compelling when the party seeking to enforce the arbitration clause is not a signatory to the agreement or even mentioned therein.

The Employment Contract also does not give any indication that other employees may be considered parties thereto or may otherwise enforce its provisions (or the provisions of the Standard Terms and Conditions).   Rather, the actual language in the Standard Terms and Conditions *excludes* employees from provisions of the clause by specifically noting only the corporate entities that benefit from the clause.   Standard Terms and Conditions § 15.1.

If Fox News Network had intended for officers or employees to benefit from the arbitration clause, it could have included such a provision in the Employment Contract, but it did not. *See Republic of Iraq*, 769 F. Supp. 2d at 614 ("had the parties intended to extend the right of arbitration, they would not have drafted an arbitration provision that singled out the 'Parties' and omitted any mention whatsoever of the Republic, as they did"); *see also Constantino v. Frechette*, 897 N.E.2d 1262, 1266 (Mass. App. Ct. 2008) ("If the nursing home harbored the intention to bring its employees within the purview of the arbitration provision, it had the duty to clearly inform its patients that the arbitration provision was intended to inure to the benefit of individual nurses as well. . . . This was not done in the contract before us, and important rights should not be waived by implication."); *McCarthy*, 22 F.3d at 360 ("A corporation that wishes to bring its agents and employees into the arbitral tent can do so by writing contracts in general, and arbitration clauses in particular, in ways that will specify the desired result.").

The Fifth Circuit's reasoning in *Westmoreland*, 299 F.3d at 467, is instructive:

Both Sadoux and Hendrickx elected to interpose liability insulating entities between themselves and Westmoreland.  For reasons advantageous to themselves they were not parties to the shareholder agreement.  And they did not negotiate an arbitration agreement regarding their personal claims and liabilities.  This was no small matter.  It gave them access to the courts for any claim they may have had against Westmoreland, subject to the limitation that they would have had to confront the arbitration agreement if they attempted to enforce the terms of that agreement.

These vital distinctions cannot be maintained by simply deploying the standard that the reach of arbitration clauses is to be read broadly, to the distinct problems of their applicability to nonsignatories.  Directly put, the courts must not offer

14

contracts to arbitrate to parties who failed to negotiate them before trouble arrives. To do so frustrates the ability of persons to settle their affairs against a predictable backdrop of legal rules -- the cardinal prerequisite to all dispute resolution.

Carlson has not sued *any* party to or beneficiary of the Employment Contract; she has not sued Fox News Network or any of its successors, assignees or affiliates. Carlson has sued only the perpetrator of the discriminatory and retaliatory conduct -- the man who demanded sexual favors from her and marginalized and humiliated her -- Ailes. The New York City Human Rights Law gives Carlson the right to sue personally and individually the employee who engaged in the discriminatory and retaliatory conduct and imposes no requirement that Carlson also sue the employer. Given the language of the Employment Contract, there would have been no basis for Carlson to have understood that a direct statutory claim against an individual personally for compensatory and punitive damages would be subject to an arbitration clause in an agreement that expressly applies only to Fox News Network and its "successors, assignees, and Affiliates." Standard Terms and Conditions § 15.1. *See Miness v. Ahuja*, 713 F. Supp. 2d 161, 164 (E.D.N.Y. 2010) ("Here, there is nothing in the Miness Employment Agreement that suggests that the defendants have a right to enforce the contract as third parties."); *see also Di Martino*, 2009 WL 27438, at *7 (holding that "[t]he language used -- and, just as important, not used -- in the Arbitration Clause makes clear that it is meant only to apply to a dispute between" the parties thereto).

Thus, Carlson did not intend or agree to waive her statutory and Constitutional rights with regard to this claim, nor was she even put on notice that she would be doing so, by entering into the Employment Contract. The Employment Contract does not "convey a definite and precise meaning" that Carlson's claim against non-signatory Ailes would be subject to arbitration. *Republic of Iraq*, 769 F. Supp. 2d at 609.

15

### B. AILES DOES NOT FIT WITHIN ANY EXCEPTION THAT WOULD ALLOW HIM TO ENFORCE THE ARBITRATION CLAUSE AS A NON-SIGNATORY

In addition to the fact that by its clear terms the Employment Contract itself shows that neither Carlson nor Fox News Network intended for her New York City Human Rights Law claim against Ailes to be subject to the arbitration clause, Ailes also does not fit within any exceptions that would allow him to enforce the arbitration clause as a non-signatory to the Employment Contract.

### 1. Carlson's Claim Does Not Fall Within the Agency Exception Because She Sued Ailes In His Individual Capacity For a Statutory Tort Claim that Does Not Derive From or Depend on the Employment Contract

Ailes relies on an "agency" theory for his motion. But the case law shows that the issue of whether a non-signatory may compel arbitration with a signatory under an exception to the doctrine of privity is a highly fact-specific inquiry. Ailes' motion, however, contains virtually no analysis of the allegations in this action. Indeed, he does not even assert that the alleged conduct, if true, was within the scope of his agency at Fox News Network. Instead, by ignoring Carlson's allegations, Ailes attempts to advance the sweeping proposition that an executive may *always* obtain the benefit of an arbitration provision in a contract between his or her employer and the plaintiff based on an agency theory. As noted above, that is not the law.

The cases cited by Ailes are distinguishable. Each of them involved claims against the non-signatory which were premised on contractual rights in the same contract that contained the arbitration clause and/or the non-signatory's liability was premised on the misconduct of the signatory. Those facts are not present here. Where, as here, a plaintiff sues a non-signatory in his or her individual capacity based on tortious conduct that is entirely independent of the contract containing the arbitration clause, courts have held that the non-signatory is not entitled to invoke the arbitration clause. And this should be especially true when, as here, the tortious

conduct violates an important human rights statute designed to protect individuals from discrimination. *See* footnote 7 *supra*.

> **a.  Neither the Contract nor Fox News Network's Conduct is at Issue in Ms. Carlson's Claim and Therefore Ailes' Cases are Plainly Distinguishable**

In the Third Circuit decision cited by Ailes, *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1112 (3d Cir. 1993), the plaintiffs were Trustees of a pension plan that opened cash management accounts with the brokerage firm Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S"). The Trustees and MLPF&S were parties to a Cash Management Agreement that contained an arbitration clause. *Id.* The Trustees' financial consultant was Stewart, an employee of MLP&S. *Id.* MLP&S's affiliate, Merrill Lynch Asset Management, Inc. ("MLAM"), also provided advisory services to the Trustees. *Id.* The Court stated that "the dispute in this case flows directly from Stewart's unauthorized purchase of several units of a limited partnership interest" that the Trustees alleged "were inappropriate for the Accounts" and "Stewart's purchases were contrary to the pension plan's stated investment objectives." *Id.* The Trustees sued MLP&S, Stewart, and MLAM under ERISA. *Id.* at 1113. The Court held that Stewart and MLAM, although non-signatories, were entitled to rely on the arbitration clause in the Cash Management Agreement between the Trustees and MLP&S. *Id.* at 1121-1122.

In so holding, the Court reasoned that the Trustees' claims were, in effect, for breach of the Cash Management Agreement. It stated that: "[I]ndeed, one is left to ponder what purpose an arbitration clause would serve if it did not encompass claims that the terms of the parties' agreement had been breached." *Id.* at 1115. The Court also reasoned that "MLAM's interests are directly related to, if not predicated upon, MLPF&S's conduct." *Id.* at 1122.[8]   Here,

---

[8] The two cases that *Pritzker* relied on also involved claims that were dependent on the contract containing the arbitration clause. *See Arnold v. Arnold Corp.*, 920 F.2d 1269 (6th Cir. 1990) (holding that officers and directors could rely on arbitration clause in stock purchase agreement

Plaintiff's claim against Ailes is completely separate from her Employment Contract and based entirely on her statutory rights.

In the next cases cited by Ailes, *Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993), the non-signatories were not simply employees seeking to rely on the arbitration clause agreed to by their employer; they were alleged to be "control persons" of certain entities that allegedly engaged in federal securities violations. There, certain investors (referred to as "Names") in Lloyd's syndicates (the entities that nominally underwrite insurance risk) sued the syndicates, the Managing Agents that managed the syndicates, the Member Agents who represented the investors in their dealings with the syndicates, and individual Chairs of the Members and Managing Agents. The Names asserted causes of action for violations of the federal securities laws and RICO in connection with their investments in the syndicates. The Names' claims against the individual Chairs were based on "controlling person" liability under section 15 of the Securities Act and section 20 of the Securities Exchange Act. *Id.* at 1358. The defendants moved to compel arbitration.

The Court found that all of the defendants were parties to or third-party beneficiaries of a contract containing an arbitration clause except for the individual Chairs.[9] *Id.* at 1359-60. The

---

between company and plaintiff in plaintiff's action against the company and the individual defendants where plaintiff asserted federal securities laws violations for fraudulently inducing plaintiff to enter into the agreement); *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1188 (9th Cir. 1986) (where plaintiff sued broker, account executive and supervisor for federal securities violations, holding that non-signatory account executive and supervisor could rely on arbitration clause in Customer Agreement between plaintiff and broker because "[a]ll of the individual defendants' allegedly wrongful acts related to their handling of [plaintiff's] securities account," which was governed by the Customer Agreement). Indeed, following *Letizia*, the Ninth Circuit confirmed in *Britton v. Co-op Banking Group*, 4 F.3d 742 (9th Cir. 1993), that for an employee to be able to rely on an arbitration clause agreed to between its employer and the plaintiff, the plaintiff's claims must be based on the contract. (*See* discussion of *Britton* at page below.)

[9] Ailes does not argue that he is a third-party beneficiary of the Employment Contract, nor could he since the Contract expressly states that it inures only to the benefit of "Fox's successors, assignees, and Affiliates" (Standard Terms and Conditions § 15.1), but not officers/employees.

18

Court held, however, that the individual Chairs also were entitled to rely on the arbitration clauses in the agreements of the Members and Managing Agents. *Id.* at 1360. In a misleading portion of his brief, Ailes selectively quotes from *Roby* for the purported proposition that: "'Courts in this and other circuits have consistently held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement. . . If it were otherwise, it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity Agents themselves.'" Ailes' Mem. at 4 (quoting *Roby*, 996 F.2d at 1360). The quote is distorted by the ellipses, which is used to omit key language from the Court's holding. This was not an oversight. The language Ailes' lawyers took out shows that the holding is narrow and inapplicable to this case. The Court held that the individual Chairs were entitled to rely on the arbitration clause because:

> The complaints against the individual Chairs are completely dependent on the complaints against the Agents. Whether the individual Chairs are disclosed agents or controlling persons, their liability arises out of the same misconduct charged against the Agents. If the scope of the Agents' agreements includes the Agents' misconduct, it necessarily includes the Chairs' derivative misconduct. Moreover, we believe that the parties fully intended to protect the individual Chairs **to the extent they are charged with misconduct within the scope of the agreements.** *Roby*, 996 F.2d at 1360 (emphasis added).

*Roby*, therefore, does not support Ailes here because the individual non-signatories in that case were sued together with the signatories on a theory of derivative liability based on alleged misconduct of the signatories within the scope of the contracts. Here, sexually harassing and retaliating against Ms. Carlson clearly was not within the scope of Ailes' official duties.

The Second Circuit's more recent decision in *Ross*, 547 F.3d 137, indicates that *Roby* should be limited to its facts. In *Ross*, the Second Circuit noted that where, as here, a "non-signatory moves to compel arbitration with a signatory, it remains an open question in this Circuit whether the non-signatory may proceed upon any theory other than estoppel." *Id.* at 143 n.3. *Ross* therefore confirms that the non-signatory Chairs in *Roby* were permitted to enforce the

arbitration agreements not based on their status as agents of the signatories, but because the claims against them were premised on the misconduct of the signatories. That is clearly not the case here. Ms. Carlson has made no claims against the signatory, Fox News Network.

> **b.      Under Facts Similar to this Case Courts Have Not Permitted Non-Signatories to Compel Arbitration**

Cases in the Third Circuit and elsewhere have held that where, as here, the non-signatory is sued in his individual capacity and the claims are not based on the contract containing the arbitration clause or on liability of the signatory, the non-signatory is not entitled to enforce an arbitration clause.

For example, in *Devon Robotics*, 2012 WL 3627419 (E.D. Pa. 2012), a company sued an officer of the counterparty to certain distribution agreements for breach of fiduciary duty and tortious interference with contract. The Court held that the officer could not compel arbitration based on an arbitration agreement between the companies. The Court distinguished *Pritzker* because the claims against the officer (DeViedma), "ar[o]se from his independent tortious conduct for which he [was] personally liable." *Id.* at *9 n.7. The Court further held that:

> [A]ny fiduciary duty DeViedma owed to Devon is by virtue of his position as COO and independent of any obligations he may have had under the agreements. At the heart of Devon's claim is the contention that DeViedma entered in a fiduciary relationship with Devon, one that may have been initially prompted by the contracts with HRSRL but was not intimately founded in or intertwined with any contractual obligation. *Id.* at *10 (internal quotes and citation omitted).

The Court also distinguished *Pritzker* on the additional ground that:

> Furthermore, in *Pritzker*, the signatory was compelled to arbitrate its same statutory ERISA claims against both the signatory-principal and its non-signatory agent. Given that the court was compelled to submit the matter to arbitration in regards to the signatory-principal, the court applied the agency exception to compel arbitration of the same matter in regards to the non-signatory agent of that principal. *Id.* at *9 n.7.

The distinctions relied on in *Devon Robotics* also apply here. Carlson has sued Ailes for "independent tortious conduct for which he is personally liable," which claim does not depend

on the terms or existence of her Employment Contract.  Ailes had a statutory and moral duty not to retaliate against and sexually harass Carlson.  That duty was independent of any employment contract.  Moreover, Carlson has elected to sue Ailes only and not the signatory to her Employment Contract, Fox News Network, as was her prerogative under the law.

Similarly, in *Britton v. Co-Op Banking Group*, 4 F.3d 742 (9th Cir. 1993), plaintiffs were investors in an allegedly fraudulent tax shelter and brought an action under the federal securities laws against the company that sold the investments and its owner.  In connection with their investments, the plaintiffs had signed a contract with the company defendant that contained an arbitration clause.  *Id.* at 743.  The individual defendant moved to compel arbitration of the claims against him on the ground, among others, that "he [was] an agent, officer, and employee" of the company." *Id.* at 744.

The Ninth Circuit affirmed the denial of his motion to compel arbitration.  It stated that "[t]he sum and substance" of the allegations against the individual defendant were that he "attempted to defraud the investors into not pursuing their law suits against the persons who originally sold the securities under the contract." *Id.* at 748.  The Court held:

> These acts are subsequent, independent acts of fraud, unrelated to any provision or interpretation of the contract.  They simply do not impose any contractual liability, vicariously or otherwise, upon Liebling.  As such, we find that Liebling has no standing to compel arbitration, even though he was an agent, officer and employee of GDL during its later months of existence. *Id.*

Other courts also have declined to permit a non-signatory to enforce an arbitration clause where the plaintiff's claim did not depend on the contract containing the arbitration clause.  *See Westmoreland*, 299 F.3d at 465 ("We have sustained orders compelling persons who have agreed to arbitrate disputes when the party invoking the clause is a nonsignatory, but only when the party ordered to arbitrate has agreed to arbitrate disputes arising out of a contract and is suing in reliance upon that contract."); *Constantino*, 897 N.E.2d at 1267 ("Merely asserting that all

agents, when acting within the scope of their agency, are entitled to benefit from the arbitration clauses -- and only the arbitration clauses -- negotiated by their principals requires an extension of the law of contracts and agency relationships, which we decline to do."); *see also Di Martino*, 2009 WL 27438, at *7 (holding that beneficiary of employee benefits plan could not compel advisory board members of the plan to arbitrate her claims against them for breach of fiduciary duty relating to their administration of the plan, even assuming that the board members were also parties to the plan containing the arbitration clause, because the plaintiff was "not asserting claims against petitioners in their representative capacity to obtain her benefits under the Plan" but rather she was "seeking damages from petitioners personally and individually, including punitive damages").

The First Circuit's decision in *McCarthy* is particularly instructive. In *McCarthy*, the plaintiff agreed to sell certain stock to the defendant, Azure, and plaintiff entered into a Purchase Agreement and a Confidentiality Agreement with a company (Theta II) that Azure had formed to serve as the vehicle for the planned purchase. 22 F.3d at 353. Azure signed the agreements on behalf of Theta II. *Id.* Both agreements contained an arbitration clause. *Id.* Pursuant to the transaction, McCarthy was to be employed by Theta II and given stock options. *Id.* at 354. Soon after the closing, however, Azure terminated McCarthy's employment and he was never given any ownership interest in Theta II, and Azure merged Theta II into a new company and began selling shares to the public. *Id.* The plaintiff sued Azure, Theta II, and the newly-created company for breach of an employment contract, wrongful discharge, fraud, misrepresentation, emotional distress, unfair trade practice and racketeering. *Id.* at 361. Azure and the companies moved to compel arbitration, but the motion was granted only as to Theta II, the party to the arbitration agreements. On Azure's appeal, the First Circuit affirmed that Azure did not have a right to enforce the arbitration agreements.

22

The First Circuit addressed many of the same cases cited by Ailes and recognized the important distinction of suing the non-signatory in an individual capacity versus an official capacity. First, the Court distinguished *Pritzker*, *Roby*, *Letizia*, and other cases like them on the ground that they "involve disputes growing out of service contracts between individuals and financial institutions" and the claims that were diverted to arbitration "were, without exception, in the nature of professional malpractice." *McCarthy*, 22 F.3d at 357. The Court held that, "[t]hus, each related directly to the essence of the service contract that the consumer-plaintiff had signed." *Id.*

The Court then discussed the legal significance between suing a non-signatory in an individual capacity versus an official capacity as follows:

> For present purposes, we regard the distinction between Azure, in his personal capacity, and Azure, in his representative capacity, as possessing decretory significance. Not coincidentally, in each of the four cases relied on by appellant the court confronted a situation in which the claim asserted related to actions undertaken by a corporate representative in his or her official, rather than personal, capacity; and each of the courts based its holding on this circumstance. *See Roby,* 996 F.2d at 1360 (concluding that the "complaints against the individual Chairs are completely dependent on the complaints against the [principals] . . . [and] arise[ ] out of the same misconduct charged against the [principals]"); *Arnold,* 920 F.2d at 1282 (similar); *see also Pritzker,* 7 F.3d at 1114 (reciting facts demonstrating that the nonsignatory was being sued for acts within the scope of her role as an agent of the signatory corporation); *Letizia,* 802 F.2d at 1188 (finding that all the individual defendants' allegedly wrongful acts related to their employment responsibilities).

> Here, in contradistinction, plaintiff asserts claims against Azure in his personal, rather than his corporate, capacity. *See supra* note 4. This is no mere semantic quibble. An official capacity suit is, in essence, "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (citations omitted). Consequently, such a suit "is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166, 105 S.Ct. at 3105. By contrast, personal capacity suits proceed against the individual, not against the entity with which the individual is affiliated.

> In the corporate context, personal capacity actions can take several forms, including by way of illustration claims alleging *ultra vires* conduct, *see, e.g., Expomotion, Ltd. v. Heidepriem–Santandrea Inc.,* 101 Misc.2d 593, 421 N.Y.S.2d 520, 521 (Civ.Ct.1979); tort suits in which a corporate officer or agent, though operating

23

within the scope of corporate authorization, "through his or her own fault injures another to whom he or she owes a personal duty," 3A William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 1135, at 66–67 (1986 ed. & Supp.1992); and, of more immediate applicability, suits alleging that a person affiliated with a corporation created or manipulated it as part of a larger (fraudulent) scheme, *see, e.g., Dietel v. Day*, 16 Ariz.App. 206, 492 P.2d 455, 457–58 (1972) (explaining that "[i]f a corporation was formed or is employed for fraudulent purposes," personal liability may be imposed).

It is, therefore, apparent that drawing a distinction between individual capacity and representative capacity claims is to draw a distinction that portends a meaningful legal difference. Indeed, the distinction between claims aimed at a defendant in his individual as opposed to representative capacity can be found across the law. . . . The ubiquity of the distinction is a reflection of the reality that individuals in our complex society frequently act on behalf of other parties -- a reality that often makes it unfair to credit or blame the actor, individually, for such acts. At the same time, the law strikes a wise balance by refusing automatically to saddle a principal with total responsibility for a representative's conduct, come what may, and by declining mechanically to limit an injured party's recourse to the principal alone, regardless of the circumstances. *Id.* at 359-60 (footnotes omitted).

Carlson's claim against Ailes falls within the line of cases of *McCarthy*, 22 F.3d 351, *Devon Robotics*, 2012 WL 3627419, *Britton*, 4 F.3d 742; *Westmoreland*, 299 F.3d 462, and *Constantino*, 897 N.E.2d 1262, and is far afield from the cases cited by Ailes. Ailes "is comparing apples to oranges." *McCarthy*, 22 F.3d at 357. Carlson sued Ailes in his individual capacity, not in his official capacity, for discrimination and retaliation that, as alleged in the Complaint, he committed alone, outside the scope of his agency, to further his own personal illicit agenda, and contrary to the professed policies of Fox News Network. Comp. ¶¶ 15, 26. Indeed, nowhere in his motion does Ailes allege that the conduct of which Carlson complains would fall within the scope of his agency as Chairman and CEO of Fox News Network. The New York City Human Rights Law expressly provides for a claim against an employee without the need to name the employer. Moreover, Carlson's claim does not rely in any way on any terms of the Employment Contract or even the existence of the Employment Contract. She would have a claim against Ailes under the New York City Human Rights Law even if the employment relationship had been at-will. The Employment Contract's language itself also

indicates an intent to exclude employees from coverage under the arbitration clause.

Under these circumstances, Ailes has not demonstrated that he is entitled to enforce the arbitration clause as a non-signatory.[10]

### c.    There Is No Policy Reason to Permit Ailes to Enforce the Arbitration Clause

Ailes also makes a policy argument based on his claim that Carlson employed a "tactical strategy" to sue Ailes and not Fox News Network to avoid arbitration.  Ailes' Mem. at 3.  Ailes' policy argument does not hold water.

As a preliminary matter, Carlson had a statutory right and legitimate reasons to sue Ailes alone, thereby invoking a remedy expressly contemplated under the New York City Human Rights Law.   As the Complaint alleges, Ailes alone made sexual advances to Carlson and

---

[10] The other cases cited by Ailes are distinguishable for the same reasons recognized in *McCarthy* and *Devon Robotics* -- namely, the plaintiffs sued the non-signatories for claims that were premised on the existence of the contract containing the arbitration clause and/or based on their involvement in alleged wrongdoing by the corporate signatory.  *See Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 222 (3d Cir. 2007) (plaintiff sued a signatory corporation and its executives for federal securities fraud in connection with a merger and the plaintiff apparently did not dispute that the executives were acting as agents for the corporation); *Marcus v. Frome*, 275 F. Supp. 2d 496, 505 (S.D.N.Y. 2003) (where plaintiff sued corporation's CEO as a "control person" for allegedly fraudulent misrepresentations in Purchase Agreement in violation of the federal securities laws, holding that "[t]he claims against [the CEO], in this case, are based on the conduct of [the corporation], and because [the corporation] would be entitled to seek arbitration under the Purchase Agreement, [the CEO], as an employee of [the corporation], is also entitled to seek arbitration under the Agreement"); *Bleumer v. Parkway Ins. Co.*, 649 A.2d 913, 931 (N.J. Super. Ct. Law Div. 1994) (decided under the FAA) (where plaintiff sued his former employer, its parent company, and an officer of the parent company for allegedly retaliatory termination under the Conscientious Employee Protection Act, holding that non-signatory parent company and officer were entitled to enforce arbitration provision because CEPA only imposes liability on those who "act[] directly or indirectly on behalf of or in the interest of an employer with the employer's consent" and therefore plaintiff "must demonstrate they acted in a representative capacity for" his employer); *Hirschfeld Prods, Inc. v. Mirvish*, 630 N.Y.S.2d 726, 727-28 (N.Y. App. Div. 1995), *aff'd*, 88 N.Y.2d 1054 (N.Y. 1996) (decided under the FAA) (permitting non-signatory officer and director of joint venture partner to enforce arbitration provision in joint venture agreement based on finding that the plaintiff's claims, although labeled as "torts," were in fact contract claims because "[t]he acts alleged in the complaint to compromise willful, malicious and wanton conduct do not represent the breach of a legal duty independent of the contract itself, arising from circumstances extraneous to, and not constituting elements of, the contract" (internal quotes omitted)).

retaliated against her for refusing them. Moreover, the Human Rights Law imposes additional limitations and hurdles to suing an employer based on conduct of an employee that are not implicated in an action against the employee alone. *See* N.Y.C. Admin. Code § 8-107(13). Indeed, Carlson alleges that Fox News "has adopted and professes to support anti-discrimination, anti-harassment and anti-retaliation policies." Comp. ¶ 26. Additionally, the Employment Contract by its express terms does not apply to officers or employees, and therefore the Contract contemplated court actions against individuals such as Ailes.

The Court in *McCarthy* addressed and rejected the same policy argument made by Ailes. *McCarthy*, 22 F.3d at 360. The Court held "that policy considerations, placed in proper perspective, tilt in the opposite direction." *Id.* First, the Court held that "the best preventative is to act *before*, rather than *after*, the fact"; in other words, to draft the arbitration clause to include employees. *Id.* (emphasis in original). Second, the Court held that "whether a claim properly lies against a party in his individual capacity or in his official capacity is ultimately a function of the facts, not of pleading techniques alone." *Id.* Third, the Court held that "we are doubtful that the incentive to plead deceitfully exists at all" because "an agent is not ordinarily liable for his principal's breach of contract" and thus "manipulating the reality of events in order to bring suit against the agent holds only marginal promise of financial reward." *Id.* at 360-61.

Finally, the Court held that "most important from a policy standpoint," permitting a non-signatory sued in his or her individual capacity to enforce an arbitration clause "would introduce a troubling asymmetry into the law" because "the agent, though he could not be compelled to arbitrate, nonetheless could compel the claimant to submit to arbitration." *Id.* at *361 ("In other words, an agent for a disclosed principal would enjoy the benefits of the principal's arbitral agreement, but would shoulder none of the corresponding burdens."). Indeed, imposing such a "troubling asymmetry" is precisely what Ailes is asking the Court to do here. He is seeking to

force Ms. Carlson to pursue her statutory discrimination claim against him in a secret arbitral chamber solely because a contract to which he is not a party contains an arbitration clause, yet if he brought a similar tort action against Ms. Carlson, he would not be burdened by any arbitration clause.

The public policy considerations are even more compelling given that constitutional and statutory rights are involved. *See Beame*, 662 N.E.2d at 756 ("The governmental policy against discrimination enjoys the highest statutory priority . . . ."); EEOC, *Advancing Opportunity: A Review of the Systematic Program of the U.S. Equal Employment Opportunity Commission* (July 7, 2016).

Public policy strongly cuts against imposing the arbitration clause on Carlson's claim against Ailes.

### 2. Carlson's Claim Against Ailes Also Does Not Fall Within the Estoppel Exception Because It Does Not Rely On the Existence of the Employment Contract

Although Ailes does not expressly rely on an estoppel theory in his motion, for the avoidance of doubt we briefly address it here.

Carlson's claim against Ailes does not fall within the estoppel exception. For this exception to apply, "the party seeking to compel arbitration must demonstrate that the party seeking to avoid arbitration relies on the terms of the agreement containing the arbitration provision in pursuing its claim." *Norcast S.AR.L.*, 2014 WL 43492, at *6 (internal quotes omitted); *Ross*, 547 F.3d at 143 (holding that the "'issues the non-signatory is seeking to resolve in arbitration'" must be "'intertwined with the agreement that the estopped party has signed'" (quoting *JLM Indus.*, 387 F.3d at 177)). Thus, "[t]he essential question [for estoppel] is whether Plaintiffs would have an independent right to recover against the non-signatory Defendants even if the contract containing the arbitration clause were void." *Miron*, 342 F. Supp. 2d at 333-34

27

(holding that estoppel did not apply because, "[w]ere this Court to find the BDO Agreement void, invalid, or unenforceable, Plaintiffs would still have valid causes of action against the Deutsche Bank Defendants grounded in both common law and statutory remedies").

Here, Carlson's New York City Human Rights Law claim does not rely on, and is not intertwined with, any terms of her Employment Contract. Carlson is not suing for breach of any provision of her Employment Contract, nor is she seeking any relief under her Employment Contract. Carlson's Complaint does not even mention any terms of her Employment Contract. Moreover, her claim under the New York City Human Rights Law does not depend on the existence of her Employment Contract. Indeed, Carlson could assert her claim under the New York City Human Rights Law whether or not she had a written employment contract.

Thus, Carlson's "claims do not 'rel[y] on the terms' of the [Employment Contract], such that [she] is estopped from denying the applicability of the Agreement's arbitration clause." *Norcast S.AR.L.*, 2014 WL 43492, at *6 (quoting *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 29 (1st Dep't 2012)).

## POINT III

### EVEN IF THE ARBITRATION CLAUSE APPLIED TO CARLSON'S CLAIM AGAINST AILES, WHICH IT DOES NOT, AILES SHOULD BE ESTOPPED FROM INVOKING IT BECAUSE HE IS IN MATERIAL BREACH OF ITS PROVISIONS

Under section 3 of the FAA, on which Ailes relies for his motion, a party is entitled to a stay of a court action in favor of arbitration only "providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3; *see also Council of W. Elec. Tech. Employees v. W. Elec. Co.*, 238 F.2d 892, 895-96 (2d Cir. 1956) (holding that defendant forfeited its right to arbitration under section 3 of the FAA).[11] Here, if the arbitration clause applied to

---

[11] Whether there is a default or waiver of the right to arbitrate is an issue for the court. *Karnette v. Wolpoff & Abramson, LLP*, 444 F. Supp. 2d 640, 644 (E.D. Va. 2006).

Carlson's claim against Ailes, which it does not, Ailes is in material breach of the clause because he has publicly disclosed documents and information about this matter and launched his army of friends and business associates to make statements and appearances in the press designed to smear Ms. Carlson and disparage her claims in violation of the arbitration clause's confidentiality restrictions. At the same time, Ailes has threatened Plaintiff's counsel with legal action. (Smith Cert. Ex. 6). The law does not allow Ailes to attempt to use the arbitration clause as a shield while publicly attacking Ms. Carlson in breach of its provisions.

Intertwined within the arbitration clause in section 7 of the Standard Terms and Conditions are confidentiality restrictions, including that "all relevant allegations and events leading up to the arbitration, shall be held in strict confidence." The arbitration clause further states that: "Breach of confidentiality by any party shall be considered to be a material breach of this Agreement." Standard Terms and Conditions § 7. If the arbitration clause applies to Carlson's claim, Ailes has willfully breached this confidentiality provision, constituting a "material breach" of the arbitration clause by its very terms. On a continuous basis from the moment Ms. Carlson commenced this action and even after he filed this motion to compel arbitration, Ailes has been disseminating to the press documents and information that clearly constitute "allegations and events" concerning this matter. He has disclosed, among other things: information concerning alleged audience ratings relating to Ms. Carlson (Smith Cert. Exs. 2 & 5); copies of handwritten thank you notes that Ms. Carlson allegedly provided to him during the course of her eleven-year career at Fox News (*id.* Ex. 3); and an internal memo that he supposedly wrote to a colleague in September 2015 concerning Ms. Carlson (*id.* Ex. 3). Forcing Ms. Carlson into arbitration now would certainly prejudice her, because it would effectively prevent her from publicly defending herself and responding to Ailes' public smear campaign -- a tactic he is reputed to have mastered over the years.

Thus, even if the arbitration clause applied to Carlson's claim against Ailes, which it does not, he has forfeited any right to enforce it since he is in material breach of its provisions.[12]

## CONCLUSION

For the reasons set forth herein, Ailes' motion to compel arbitration and stay judicial proceedings should be denied.[13]

**SMITH MULLIN, P.C.**
Attorneys for Plaintiff Gretchen Carlson

Dated:  July 15, 2016

By: _____
NANCY ERIKA SMITH

---

[12] Ailes' claim that Carlson breached the arbitration agreement by filing this action would not give him a basis to breach its provisions in response. "Under settled election-of-remedies principles, when one party to a contract feels that the other contracting party has materially breached its agreement, the non-breaching party may either stop performance and assume the contract is voided, or it may continue its performance and sue for damages," but "*under no circumstances may the non-breaching party stop its own performance while continuing to take advantage of the contract's benefits.*" *Lafarge Bldg. Materials, Inc. v. Pozament Corp.*, 28 Misc. 3d 1228(A), 2010 WL 3398537, at *8 (N.Y. Sup. Ct. Aug. 24, 2010) (emphasis added). Since Ailes has "stop[ped] [his] own performance" under the arbitration clause, he is not entitled "to take advantage of the [arbitration clause's] benefits." *Id.*

[13] If the Court believes there are issues of material fact that need to be resolved with regard to this motion, then Plaintiff will assert her right to a jury trial under 9 *U.S.C.* § 4.